[Civ. No. 405.    Third Appellate District.—January 3, 1908.]

## PAUL C. HARLAN, Appellant, v. OSCAR C. SCHULZE, Respondent.

HOMESTEAD—DECLARATION BY WIFE FOR JOINT BENEFIT—VALIDITY— USE BY WIFE FOR PROSTITUTION—HUSBAND'S KNOWLEDGE NOT SHOWN.—Where a homestead, comprising a dwelling of four rooms on a city lot, with usual outbuildings, purchased by the husband in the wife's name, was declared by her, in valid form, for their joint benefit, it inured to the benefit of the husband as well as the wife; and its validity is neither affected by the fact that the husband, who is not shown to have any other place of residence, was absent part of the time in the course of his employment, nor by the fact that, during his absence, without any showing of knowledge on his part, the home was used by the wife for purposes of prostitution, and was so used by her when the homestead was declared.

ID.—CONSTRUCTION OF HOMESTEAD ACT—PERSONAL QUALIFICATIONS NOT PRESCRIBED.—The homestead act prescribes no personal qualifica-

tions touching the moral character of the claimant, and does not undertake to exclude the vicious, the criminal or the immoral from the protection given by it.

Id.—Crime—Construction of Penal Code—Property not Forfeited. If living in a house of prostitution is a crime under section 315 of the Penal Code, yet in view of section 677 of the same code a conviction therefor could not have the effect to work any forfeiture of property not expressly imposed by law.

Id.—Personal Character of Wife as Claimant.—The personal character or conduct of the wife as claimant of the homestead, however immoral, cannot be inquired into and made the test of her right to claim a homestead for the joint benefit of herself and husband.

Id.—Valid Claim of Homestead—Incidental Use for Prostitution. Where the claim of the homestead is valid on its face, and there is nothing therein to indicate that it is to be used for any other purpose than as a residence for husband and wife, the incidental use by the wife of the home for purposes of prostitution does not destroy the right to the homestead.

Id.—Transfer of Homestead.—The wife, in whom the title was vested, could not convey the homestead, and her moral character cannot affect that question. The homestead can only be transferred by the joint deed of husband and wife.

APPEAL from a judgment of the Superior Court of Solano County. L. G. Harrier, Judge.

The facts are stated in the opinion of the court.

Paul C. Harlan, Appellant, *in propria persona.*

Geo. A. Lamont, for Respondent.

CHIPMAN, P. J.—Action to quiet title. The land in controversy is a certain lot situated in the town of Dixon, Solano county. The complaint is in the ordinary form of an action to quiet title. Defendant denies the averments of the complaint and avers that at the time the action was commenced he was the owner in fee of the premises. It is further averred that on November 3, 1904, one Josephine Quick was the owner of the land, and on that day conveyed the same to Albert Manning, who on November 9, 1904, conveyed the same to defendant. The answer then sets forth that plaintiff claims title through a deed dated December 2, 1905, from said Jose-

phine Quick and William Quick, her husband; avers that Josephine Quick, on October 5, 1901, filed "a pretended declaration of homestead which declaration is claimed by plaintiff to be a valid homestead declaration"; that plaintiff took said deed with notice of said deed to said Manning; that at the time said pretended homestead was filed "the house upon said premises was not suitable for the dwelling of a family and was not a dwelling, but was a place of business, to wit, a house of prostitution."

The court made the following findings of fact: That at the commencement of the suit plaintiff was not the owner of the premises; that at that time defendant was the owner in fee thereof; that said Josephine Quick was the owner in fee simple of the land on November 3, 1905, and on that day conveyed the same to said Manning, who sold and conveyed the same to defendant on November 9, 1905; that plaintiff claims title under deed, dated December 2, 1905, "made by William Quick and Josephine Quick, husband and wife"; that at the time of its execution plaintiff had actual notice of the previous grants by Josephine Quick to Manning and by Manning to defendant; that on October 4, 1901, said Josephine "executed and acknowledged in proper form, and on October 5, 1901, recorded . . . a declaration of homestead on said real property"; that at that time "she was a married woman and was the wife of William Quick, the only other member of the family, and was residing upon the said real property, but her family did not then reside upon said real property and that the following recital in said declaration of homestead was untrue, to wit: 'I do now, at the time of making this declaration, actually reside with my family on the land and premises hereinafter described'; and that all other recitals contained in said declaration of homestead were true." The court further found that, at the time of the execution of the homestead, October 4, 1901, "in physical character, the dwelling-house situated on said real property was capable of being used as a human habitation and residence and was actually so used by said Josephine Quick on said October 4, 1901, but was incapable of being a home, by reason of being a house of prostitution; and that by reason of the carrying on of said unlawful business of prostitution in said dwelling-house, the before described declaration of homestead executed on October 4, 1901,

was of no force or effect, and was invalid and void." For like reason the court found that the house on the premises "was not suitable for the dwelling of a family and was not such dwelling," but "was a house of prostitution."

As conclusions of law the court found that said premises could not, on October 5, 1901, be selected as a homestead and the declaration of homestead was void, and that plaintiff is entitled to no relief. Judgment was thereupon entered for defendant, from which plaintiff appeals on bill of exceptions.

All the findings of fact adverse to plaintiff are challenged for insufficiency of facts to support them. The undisputed evidence was that at the time the homestead was declared the fee simple title to the lot was in Josephine Quick; that she and her husband first rented the property and were living on it when her husband bought it and the deed was made to Mrs. Quick; that she was then the wife of William Quick and that they both resided at that time on the premises; that the husband worked away from his home at times for different persons in the neighborhood, but made the premises his home and had no other; that the family consisted of Quick and his wife. A copy of the homestead declaration is in the record and conforms in all respects to the requirements of the statute and on its face is valid. The declaration, among other things, stated: "I declare that I have not heretofore made a declaration of homestead; and I declare that my husband has not heretofore made a declaration of homestead; and I, therefore, make this declaration for the joint benefit of myself and husband."

Mrs. Quick testified: "There were three buildings upon this property; a house; a woodshed and a closet. In the house there were four rooms; Mrs. Crandall, my servant, made a bedroom out of the front room, next to that was a sitting-room, then my bedroom and then a kitchen. Those were all the rooms in the house. They were used by each one of us as part of our home at that time. I resided there; that was the only home I had. My husband resided there at that time. He worked on the electric light line; sometimes he went away from Dixon to his work, at other times he worked around near Dixon. All the rooms were convenient for use by Mr. Quick and myself as a home." The property cost originally $125 and was estimated in the homestead declaration to be worth

$300. Defendant testified that he paid Manning $200 for it. The evidence that the house was used as a house of prostitution was mostly hearsay and circumstantial, and was based upon the character of the people going to and coming from the place and the character of women occasionally seen there. There was no evidence that women resided in the house and were engaged with Mrs. Quick in carrying on the business of prostitution, or that any persons resided there other than as testified by Mrs. Quick. One of the witnesses testified: "I do not know whether it was a place of business or merely the rendezvous of people." Another witness testified: "I don't know of my own knowledge that the business of prostitution was going on in there, but from others; I concluded so from the fact that certain men from around town were going there." Defendant testified: "Mrs. Quick was living in that house across the street from me; it seemed to be her home so far as I knew; it was capable of being used as a residence, and was at that time the home of this woman." Much of the testimony related to the character of the house some time after the homestead was declared.

Appellant makes the point that his objection to the testimony introduced to prove prostitution by common reputation should have been sustained and that section 315 of the Penal Code, as amended in 1905, which permits the keeping of a house of ill-fame to be proved by common repute, is not retroactive and did not warrant the introduction of such proof of acts occurring long prior to the amendment; that the section did not make reputation competent proof of the *use* of a house for the purposes of prostitution; that while the "ill-fame" (or evil notoriety) of a house may be shown by hearsay, the *use* of the house for prostitution must be established as a fact. (Citing *State* v. *Haberle*, 72 Iowa, 138, [33 N. W. 461].) We think, however, there was evidence sufficient to justify the inference that at the time the homestead was declared persons visited the house for purposes of prostitution, although there was no witness of the act itself being committed. We prefer to deal with the specific ground upon which the court based its decision that the homestead was invalid, rather than consider the alleged errors in admitting testimony. Indeed, this is the only ground urged by respondent in support of the findings and judgment.

"The homestead consists of the dwelling-house in which the claimant resides, and the land on which the same is situated, selected as in this title provided." (Civ. Code, sec. 1237.) The declaration must contain, when made by the wife, "that her husband has not made such declaration, and that she therefore makes the declaration for their joint benefit. 2. A statement that the person making it is residing on the premises, and claims them as a homestead." There is no pretense that the husband had a residence elsewhere, and both he and his wife testified that at the time the homestead was declared neither of them had any other residence, but that this property was their only residence and as to the wife the court found that she resided on the premises. The statute requires only that the "claimant" shall show residence. The temporary absence of the husband, his employment away from his home, in the absence of any showing that he had taken up a residence elsewhere, would not prevent the wife from securing the benefits of the homestead act for herself and husband. (See *Gambette* v. *Brock*, 41 Cal. 78; *Skinner* .v. *Hall*, 69 Cal. 195, [10 Pac. 406].) Once created the homestead "can be abandoned only by a declaration of abandonment, or a grant thereof, executed and acknowledged." (Civ. Code, sec. 1243; *Simonson* v. *Burr*, 121 Cal. 582, [54 Pac. 87] ; *Freiermuth* v. *Steigleman*, 130 Cal. 392, [80 Am. St. Rep. 138, 62 Pac. 615], and cases there cited.)

We do not understand respondent to controvert these propositions. It is said in his brief: "The home that homestead laws were made to protect is the home of decency and respectability, where a man and his wife may live without reproach and their children raised without shame." It is furthermore claimed that the premises were "primarily a place of business and could not be selected as a homestead." (Citing *Laughlin* v. *Wright*, 63 Cal. 113; *McDowell* v. *His Creditors*, 103 Cal. 264, [42 Am. St. Rep. 114, 35 Pac. 1031] ; *Beronio* v. *Ventura County L. Co.*, 129 Cal. 232, [79 Am. St. Rep. 118, 61 Pac. 958].)

The ideal home which respondent describes is greatly to be desired, but does the law make it a prerequisite to claiming the benefit of a homestead? So far as is disclosed by the homestead act no personal qualifications, touching the moral character of the claimant, are prescribed. Nor does the statute un-

dertake to exclude the vicious, the criminal or the immoral from the protection given by it, or to deprive them from the shelter intended thus to be thrown around the family, however unworthy. The right to declare a homestead on one's home is in no wise dependent upon right living. If we may inquire into one species of immorality, why not into all; and where can a just line of discrimination be drawn? There may be irreconcilable differences between husband and wife; they may be committing acts of cruelty toward each other at times unbearable; the marriage vow may be recklessly violated by one or the other; the children may be surrounded by an atmosphere destructive of moral health or growth and daily witnesses of revolting conduct by their parents, and yet, we see nothing in the law that would prohibit such a family from protecting itself by a valid homestead. The homestead is as much for the benefit of the husband (and children where there are any) as for the wife, and there is not the slightest evidence in this case that the husband was a party or had knowledge of the conduct of his wife and the uses she made of their home in his absence. Judge Baldwin said in *Lies* v. *De Diablar,* 12 Cal. 328: "The adultery or abandonment by the wife did not divest the property of the character of homestead. . . . We do not see that the statute has made the crime of adultery, or abandonment, or desertion by the wife of the husband, or of the family, a cause of defeating or impairing her right."

*Prince* v. *Hake,* 75 Wis. 638, [44 N. W. 825], was an action to restrain the sheriff from selling on execution certain lots which constituted the homestead of plaintiff's intestate, Mahoney, when the judgment was recovered. The answer alleged "by way of avoidance of Mahoney's homestead right, that at the time of docketing such judgment, the only building upon the lots in question used as a residence was, and ever since has been, a bawdy-house—an open and notorious house of prostitution—used and kept as such by Mahoney, and well known to be such by him and his family; also that during all that time Mahoney sold liquors upon said lots without any license, and contrary to law." The court on appeal directed that the demurrer to the answer be sustained. Speaking of the effect of the homestead the court said: "This exempted the property from sale on execution for his debt, no matter to what other uses he put it, or that he used it for criminal purposes,

or committed crime upon it. The statute exempts from seizure and sale, on execution, a certain quantity of land owned and occupied by any resident of the state as a homestead. The exemption is unqualified. No exception is made against an occupant who conducts an unlawful business, or commits crime upon such premises, and the courts have no authority to interpolate such an exception therein. The law provides the punishment which may be inflicted upon a person convicted of the crimes with which Mahoney is charged, but the forfeiture of his homestead right is no part of such punishment. . . . In the present case the right to the exception does not depend upon the business in which Mahoney was engaged, but upon his ownership and occupancy of the premises as his home. Surely the vilest of criminals out of prison may have a home.''

In discussing the subject Mr. Freeman says: ''If, however, we concede that the dishonest are not worthy the benefits of the exemption laws, it still seems that we should not, as judges, enforce our peculiar ideas until they had met the supreme approval of the legislature. Judges ought not to pronounce sentence where the law has provided no penalty. Besides, it must be remembered that one of the chief objects of these laws is to protect and provide for the debtor's family, and that this object would be partially subverted by making the benefit of the law depend upon the character of the debtor.'' It was said in *Vandall* v. *Teague,* 142 Cal. 471, [76 Pac. 35]: ''While the husband and wife are living the homestead can be destroyed only by the joint act of both husband and wife''; and speaking of the operation of a general statute (of which the homestead statute is an example) the court said: ''It must be applied generally and in all cases where exception to its operation is not specifically made.'' We are unable to see that any different rule should prevail in the construction of the statute authorizing the creation of the homestead and in construing that other part of the same statute which relates to its abandonment or its sale on execution. If residing in a house of prostitution is a crime, as suggested by respondent in view of section 315 of the Penal Code, we must not overlook section 677 of the same code, which declares: ''No conviction of any person for crime works any forfeiture of any property, except in cases in which a forfeiture is expressly imposed by law; and all forfeitures to the people of this state, in the

nature of a deodand, or where any person shall flee from justice, are abolished.''

The remaining question is, Were the premises used primarily as a place in which to carry on the business of prostitution within the rule laid down in the cases cited by respondent? It becomes necessary to examine these cases. In *Laughlin* v. *Wright,* 63 Cal. 113, the court said: ''The *use* of the property is an important element to be considered. From the record in this case it appears that the premises in question were used by the Wrights (the owners) primarily and principally as a hotel for the accommodation of the public. It was so used at the time of the filing of the declaration, and until August, 1874, when, because of the embarrassed condition of their business, they left the hotel and put it in other hands. The Wrights, it is true, lived in the hotel until August, 1874, but their residence there was incidental to the business of 'running the hotel.' '' In *McDowell* v. *His Creditors,* 103 Cal. 264, [42 Am. St. Rep. 114, 35 Pac. 103], McDowell was an insolvent and petitioned the court to set apart the real property in question as a homestead. The facts were that he erected the building on the premises ''for the special purpose of boarding and lodging railroad men and the public generally. As first constructed, the building consisted of a barroom, office, dining-room, and eight sleeping-rooms, but during the year it was enlarged somewhat. A large sign was placed upon it designating it as the 'El Monte Hotel,' and by that name it was advertised in the newspapers and by cards. From the time of its completion . . . appellant used the building primarily as a hotel.'' The court said: ''The evidence clearly tended to show that the building was constructed to be used, and from the time of its construction it was used, primarily and principally, as a hotel for the accommodation of the public. And it was being so used by appellant at the time he filed his declaration of homestead. This being so, the case is plainly within the rule declared in *Laughlin* v. *Wright,* 63 Cal. 113.'' In *Beronio* v. *Ventura County Lumber Co.,* 129 Cal. 232, [79 Am. St. Rep. 118, 61 Pac. 958], it appeared that Beronio ''was the owner of the land involved in the action, and built thereon a two-story brick building for the purpose of conducting therein a general merchandise store and hotel. He was at that time unmarried, and with his servant conducted

said business and hotel until March 29, 1886, when he married, and thereafter with his wife continued to conduct the business, occupying a portion of the building with his family for that purpose. . . . February 3, 1887, he executed and acknowledged a declaration of homestead upon said lot, sufficient in form, and the same was filed with the county recorder." Upon the authority of *Laughlin* v. *Wright* and *McDowell* v. *His Creditors*, it was held that the declaration did not have the effect to impress the property with the characteristics of a homestead.

In the recent case of *Estate of Levy*, 141 Cal. 646, [99 Am. St. Rep. 92, 75 Pac. 301], Mr. Justice Angellotti discusses the subject and reviews the cases in a manner to leave nothing further to be desired. The doctrine of *Heathman* v. *Holmes*, 94 Cal. 291, [29 Pac. 404], is fully approved. The court, in the latter case, speaking through Mr. Justice McFarland, said: "In the case at bar, it is not contended by respondents that the appellants did not continue to reside in the building and make it their home, or that they had any other residence or home. . . . But it is contended that because for part of that time they leased part of the building, although residing themselves in the part not leased, therefore they lost the right of homestead. We cannot concur in this view. To do so would be to hold that appellants lost their residence without changing it, and left their home without going away. . . . It would be strange, indeed, if the occupants of a house could not use part of it for family revenue, no matter how favorable the opportunity might be to do so, without forfeiting the home itself."

In *Estate of Levy* the court, referring to cases cited, said: "These cases are all authority for the proposition that if the building is the actual *bona fide* residence of a party, he may legally select it and the land on which it is situated as a homestead, even though, incidentally, a part thereof, no matter how large, may be used by him for other purposes than the family residence. . . . In no case has it been decided that where a portion of a building is dedicated to residence purposes, and is actually occupied by the claimant as the home of himself and his family, and such occupation is not merely incidental to the carrying on of some business in other parts of the building, the building and the land on which it is situated cannot be legally selected as a homestead."

The undisputed testimony was that Mrs. Quick lived upon the homestead premises and that it was the only house or residence she and her husband then had; the defendant testified that this was her home and the court found that she resided there.    There is not a particle of evidence that the primary object of the family in purchasing and occupying the place was to establish and carry on the business of prostitution; that the residence was incidental to the business.    On the contrary, whatever of this kind of business was carried on in the house was incident to the residence of the family.    Unless we can say that this incidental use destroyed the right to claim a homestead because of its immorality, we cannot say that the homestead was void.    That the personal character of the claimant or her personal conduct, however immoral, in conducting her home can be inquired into and alone made the test of her right to a homestead we do not believe.    If she can declare a homestead, though she earns a living in part and incidentally by the art of millinery, or renting rooms, or other legitimate occupation, there is no law that would deprive her of this right because she violated the seventh commandment. The cases all hold that the statute is remedial and should be given a liberal construction.

Defendant's title rests upon the deed of Mrs. Quick who, as we have seen, could not alone make a valid conveyance. Plaintiff's title, the homestead being valid, rests upon the deed executed by both husband and wife and conveyed the fee. The findings to the contrary are not supported by the evidence.    The judgment is, therefore, reversed.

Hart, J., and Burnett, J., concurred.